**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LEAGUE OF WOMEN VOTERS OF CHICAGO, JODI BIANCALANA, BRUCE CROSBY, WILLIAM K. CROSBY, STEPHANIE CROWELL, IGNAZIA ANGELA DIADONE, JIM IGNATOWSKI, GERALD A. JUDGE, AMELIA KABAT, ERNIE LUKASIK, KEITH MCDONALD, ROBERT MCKAY, LYNN SEERMON, PATRICIA SWINDLE, AND ALONSO ZARAGOZA, | ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 13 cv 2455 |
| v. | ) ) | Judge Sharon Johnson Coleman |
| TIMOTHY WOLF, et al., | ) ) | |
| Defendants. | ) | |

**Memorandum Opinion and Order**

Plaintiffs, League of Women Voters and fourteen of their members (collectively "LWV" or "plaintiffs") filed a seven-count Complaint alleging constitutional and state law violations arising from the defendant City of Chicago's ("City") new redistricting plan for the 2015 aldermanic elections. Plaintiffs assert that the City has deprived plaintiffs of their right to vote and have acted ultra vires of state law through the de facto implementation of the new ward map before the 2015 election. Plaintiffs also assert that the new ward map itself is unconstitutional as a violation of the "one person, one vote" principle, and the new ward map as drawn violates state law. The City moves to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) for lack of standing and for failure to state a claim upon which relief can be granted. This Court heard arguments on the motion on July 15, 2013. For the reasons stated below, the motion is denied as to standing and granted for failure to state a claim.

1

**Background**

League of Women Voters of Chicago is a nonpartisan political organization that encourages informed and active participation in government. The individual plaintiffs are Chicago residents and LWV members. The City of Chicago is a municipal corporation. Pursuant to 65 Ill. Comp. Stat. 20/21-37, the City enacted an ordinance to redistrict the fifty aldermanic wards following the decennial census in 2010. Divided equally among the 50 wards, the population of each ward should be 53,912 based on the 2010 census results that City population was 2,695,598.

In 2011, a City Council Committee was convened to conduct hearings, receive and consider proposed redistricting plans. On January 17, 2012, Rahm Emanuel, Mayor of the City of Chicago, called a special meeting of the City Council on January 19, 2012, to consider and vote on an ordinance amending Title II, Section 8 of the Municipal Code regarding ward boundaries. The proposed ordinance was made public a half hour before the meeting. The City Council approved the proposed ordinance without a floor debate by 41-8 vote. The new map has deviations in population of up to 8.7 percent in population. Plaintiffs also allege that several of the new wards have "grotesque shapes and boundaries," particularly the Second and Thirty-Sixth Wards, and fragments neighborhoods into multiple wards.

Plaintiffs seek a preliminary and permanent injunction preventing the City from implementing the new ward boundaries prior to the 2015 election. Plaintiffs also seek a preliminary and permanent injunction preventing implementation of the January 19, 2012, Ordinance and directing the City to develop and adopt a redistricting plan that is in compliance with 65 Ill. Comp. Stat. 20/21-36 with respect to each of the fifty wards.

**Legal Standard**

*Federal Rule of Civil Procedure* 12(b)(1) provides for dismissal of a complaint for lack of subject matter jurisdiction. Standing is an essential jurisdictional requirement; "[i]n essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or particular issues." *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). As with a Rule 12(b)(6) motion, the district court must "accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff." *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007)(quoting *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999)). However, when a defendant challenges subject-matter jurisdiction, the plaintiff bears the burden of establishing jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992).

Federal Rule of Civil Procedure 8(a)(2) sets forth the basic pleading requirement that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Rule 8 does not require the plaintiff to plead particularized facts, but the factual allegations in the complaint must be enough to raise a plausible right to relief above the speculative level. *See Arnett v. Webster*, 658 F. 742, 751-52 (7th Cir. 2011). In order to survive dismissal, plaintiff must plead "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009). When ruling on a motion to dismiss brought pursuant to Rule 12(b)(6), courts accept all well-pleaded allegations in the complaint as true, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (7th Cir. 2004), and draw all reasonable inferences in favor of the plaintiff. *Pisciotta v. Old Nat. Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007).

**Discussion**

*I.     Standing: Rule 12(b)(1)*

Under Article III of the U.S. Constitution, federal courts are limited to hearing "Cases" and "Controversies." Standing is therefore a jurisdictional prerequisite to bringing a lawsuit. *Friends of the Earth, Inc. v. Laidlaw Envlt. Servs., Inc.,* 528 U.S. 167, 180 (2000). To establish standing, "a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not con-jectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.,* 129 S. Ct. 1142, 1149, 173 L.Ed. 2d 1 (2009).

Here, plaintiff League of Women Voters is asserting standing as an organization through some of its members (the fourteen individual plaintiffs). An organization has standing when: (1) any of its members has standing, (2) the lawsuit involves interests "germane to the organization's purpose," and (3) neither the claim asserted nor the relief requested requires an individual to participate in the lawsuit. *Sierra Club v. Franklin County Power of Ill., LLC,* 546 F.3d 918, 924 (7th Cir. 2008). Plaintiffs bear the burden of establishing standing. *Pollack v. United States DOJ,* 577 F.3d 736, 739 (7th Cir. 2009).

In this case, only the first element of organizational standing is at issue, i.e., whether any named member has standing in his/her own right. The City effectively concedes that League of Women Voters has organizational standing for Counts I and II by admitting that plaintiff Ignazia Angela Diadone has standing. However, there is no such concession as to whether any individual plaintiff members of LWV have standing to sue on Counts III-VI.[1] The allegations related to

---

[1] Plaintiffs' argument in their response brief treats the issue of standing as a foregone conclusion and, rather than articulate how any of the individual plaintiffs meets the standing requirement, they simply assert that the complaint states that the actions of defendants violate the rights of LWV Chicago members and cite to another LWV lawsuit in

redistricting in Counts III-VI are based on *Equal Protection* arguments relating to the population distribution and shape and contours of the new wards. The Complaint contains a paragraph that states, "Biancalana, Crowell, Diadone, Ignatowski, Judge, Kabat, Lukasik, McDonald, Seermon, and Zaragoza are in wards with more than 53,912 persons according to the census taken in 2010, and accordingly have less than an equal right to vote." (Compl. Dkt. #1, at ¶ 20). The Complaint also alleges that its members, Lynn Seermon, and Alonso Zaragoza, live in the Second and Thirty-Six Wards under the current map, but will be in different districts under the 2015 map. (Compl. Dkt. #1, at ¶¶ 17, 19). These allegations are sufficient to support standing in Counts III-VI that relate to population deviation and the shape of the new wards at this stage of the proceeding. Therefore, this Court denies the City's motion to dismiss pursuant to *Rule 12(b)(1)* for lack of standing.

## II.     Failure to State a Claim: Rule 12(b)(6)

### 1. Early Implementation: Counts I and II

In Count I, plaintiffs allege the mid-term implementation of the redistricting plan is a denial of Equal Protection under the *Fourteenth Amendment.* LWV alleges that the City has begun using the 2015 ward map to make decisions and react to constituents in a de facto early implementation of the 2015 redistricting plan that denies constituents representation by the aldermen for whom they voted and effectively denies their right to vote. The City denies that the City Council has implemented the 2015 map. The City also moves to dismiss Count I for failure to state a claim, arguing that LWV does not allege a pervasive policy that violates the right to vote or intentionally discriminates against a protected class.

---

which the court found organizational standing. However, in that case, *League of Women Voters v. Quinn,* No. 11-cv-5569, 2011 U.S. Dist. LEXIS 125531, at *4 (N.D.Ill. Oct. 27, 2011), the defendants dropped their challenge to standing in their reply brief thereby conceding the issue and the court found organizational standing sufficiently pled when LWV asserted that they had members in every legislative district and the injury at issue was a violation of their *First Amendment* right to speak. Further, plaintiffs reference only Counts I and II in their argument in support of standing.

The first step in evaluating a claim that a law or a government action violates the *Equal Protection Clause* is to determine the appropriate standard of review. *See Dunn v. Blumstein,* 405 U.S. 330, 335 (1972). Here, plaintiffs assert that the burden on the right to vote as alleged here requires something more than rational basis review, though they stop short of arguing for the application of strict scrutiny. They point to *Burdick v. Takushi,* 504 U.S. 428 (1992), as authority for applying a more stringent standard of review to right to vote claims.

In *Burdick*, the Supreme Court affirmed a judgment holding that a prohibition on write-in voting, taken as part of the state's comprehensive election scheme, did not impermissibly burden the right to vote. *Id.* at 442. The court stated that the appropriate standard for evaluating a claim that a state law burdens the right to vote is set forth in *Anderson v. Celebrezze*, 460 U.S. 780, 788, 75 L.Ed. 2d 547, 103 S. Ct. 1564 (1983). Therefore, "[a] court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the *First* and *Fourteenth Amendments* that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788).

LWV also analogizes *Tully v. Edgar,* 171 Ill. 2d 297, 664 N.E.2d 43, 215 Ill. Dec. 646 (1996), in support of its argument for applying a higher standard of review. In *Tully,* the plaintiffs challenged a Public Act that changed the process of selecting trustees to the board of the state university from an elective process to an appointive process. *Id.* at 299. Applying a strict scrutiny standard, the court nullified the provision of the Act that immediately removed the sitting trustees from office as violating the Illinois Constitution. *Id.* at 312. Here, however, plaintiffs are not facing a permanent disenfranchisement similar to the situation in *Tully*, nor are

they challenging an election law, as in *Burdick*. LWV are essentially alleging that certain voters are disenfranchised because the boundaries of their ward have been redrawn and some City Council members are using the 2015 ward map to inform their decisions and respond to constituents.

Without conceding that city council members have begun using the new ward map, the City contends that rational basis review applies here because this situation is similar to the temporary disenfranchisement that occurs when reapportionment is combined with a staggered system of elections. *See e.g., Donatelli v. Mitchell*, 2 F.3d 508 (3d Cir. 1993). This Court agrees.[2]

In *Donatelli*, the Third Circuit Court of Appeals confronted the question of whether the plaintiffs' right to vote for a state senator under Pennsylvania law had been infringed because they had been "assigned" a senator who was not elected by their district, or any significant portion of it. *Id.* The court held that the claim had no constitutional basis and numerous courts have concluded that temporary disenfranchisement, of the kind experienced by the *Donatelli* plaintiffs, resulting from the combined effect of reapportionment and a staggered election system meets the rational basis test and therefore does not violate the *Equal Protection Clause. Id.* at 518.

Courts consistently apply rational basis review to temporary disenfranchisement from reapportionment claims and none that this Court has found nor any cited by plaintiffs have found

---

[2] At oral argument on this motion, plaintiffs argued that *Baldus v. Members of the Wisconsin Government Accountability Board, et al.*, 849 F. Supp. 2d 840, 850 (E.D. Wis. 2012), limited the holding in *Donatelli* and is controlling authority. The Court notes that *Baldus* is a district court decision, though a three-judge panel selected by the Seventh Circuit Court of Appeals decided the case. *Baldus* refers to *Donatelli* and *Republican Party of Oregon* for the proposition that "some degree of temporary disenfranchisement in the wake of redistricting is seen as inevitable, and thus presumptively constitutional, so long as no particular group is uniquely burdened." 849 F. Supp. 2d at 852. The court goes on to state that when deciding how much disenfranchisement is too much, courts should look at the facts of the case before it. *Baldus* found that the temporary disenfranchisement of 300,000 Wisconsin voters did not violate the Equal Protection Clause. *Id.* at 852-53.

an *Equal Protection Clause* violation. *See, e.g., Republican Party of Oregon v. Keisling,* 959 F.2d 144, 145-46 (9th Cir. 1992) ("[I]n the context of reapportionment, a temporary dilution of voting power that does not unduly burden a particular group does not violate the equal protection clause."). "The state decision-makers need not actually articulate the purpose or rationale supporting the classification; nor does the state have any obligation to produce evidence to sustain the rationality of its decision." *Donatelli,* 2 F.3d at 515. Classifications subject to rational basis review are accorded a strong presumption of validity. *Id.*

Here, as in *Donatelli*, nothing in the Complaint suggests that plaintiffs' access to the electoral process is restricted or that they will not be able to vote in the next regularly scheduled election. Plaintiffs argument that the right to vote continues for the length of an elected term seems to suggest that it is the right to have the <u>same elected official</u> rather than merely a representative elected by someone for the duration of the term. By extension that interpretation of the right to vote means that anyone whose chosen candidate lost has been impermissibly disenfranchised until the next election. This reading of the right to vote is not borne out by the case law – *Tully* holds that voters cannot be <u>permanently</u> disenfranchised; *Jackson v. Ogilvie,* 426 F.2d 1333 (7th Cir. 1970), holds that voters have a right to have elected positions filed when they become vacant; *Judge v. Quinn*, 612 F.3d 537 (7th Cir. 2010), holds that the governor had a duty to issue a writ of election to fill the senate vacancy left by President Barack Obama. However, no court has found a violation of equal protection where there is a temporary disenfranchisement.

Plaintiffs admit that no official action implementing the 2015 map has taken place, but instead they point to a few incidents of individual aldermen taking or refusing action based on the new map. Plaintiffs argue that, "the City's decision to implement the new map imposes real

limitations on the aldermen's power to be responsive, and on their ability to represent their constituents' interests effectively." (Resp. Br. Dkt. # 24, at 21). Yet, there is no indication that aldermen are prevented from acting according to the current map. Aldermen are sitting in wards that in some instances have new boundaries for the 2015 election. They are aware of the new boundaries because they voted on the new plan, and thus are also aware that they will have new constituents in the 2015 election. It is the nature of the political process that some elected officials may consider it politically beneficial to be responsive to their constituents under the new map. This Court is not and should not be in a position of reviewing decisions of individual aldermen to ensure that they are serving their current constituents. LWV fails to state a claim for violation of the right to vote under the *Equal Protection Clause.*

Count II alleges that de facto implementation of the new ward map, is an *ultra vires* act that the City has no authority to do under state law. Specifically, plaintiffs allege that the City has violated 65 Ill. Comp. Stat. 20/21-38, which states in relevant part: "All elections of aldermen shall be held from the existing wards until a redistricting is had as provided for in this article." The City moves to dismiss Count II for failure to state a claim because the factual allegations do not support an inference that the City has not complied with 65 Ill. Comp. Stat. 20/21-38 since nothing in the statute governs how aldermen conduct City business once they are elected. The City further argues that the allegation that the 2011 aldermanic election results are nullified by the early implementation of the 2015 ward map in violation of the Illinois Constitution is a legal conclusion and therefore fails to state a claim.

Plaintiffs' claim that early implementation violates the Illinois Constitution's equal protection clause fails for the same reason that its U.S. Constitutional claim fails in Count I. With respect to whether the alleged early implementation of the new map is an *ultra vires* act,

9

that claim survives dismissal. The Complaint adequately alleges that some alderman have chosen to act based on the new map without any basis for doing so under state statute and thus this claim is sufficiently stated.

    2. *The New Ward Map: Counts III-VI*

        a. *Counts III and VI*

Count III alleges a violation of the one person, one vote principle of the Equal Protection Clause articulated in *Reynolds v. Sims,* 377 U.S. 533, 568, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964), because the redistricting plan divides the fifty wards unequally. Specifically, plaintiffs assert that under the new ward boundaries the population deviations between "low" population and "high" population are as high as 8.7 percent and there is no practical reason for failing to enact a more equal plan. Count IV asserts that the plan also violates the Illinois statute that provides the population of Chicago's fifty wards "be as nearly equal as practicable." 65 ILCS 20/21-36. The City moves to dismiss Counts III and IV on the basis that they fail as a matter of law because courts have held redistricting plans with maximum population deviations of less than 10% as prima facie valid. The City also asserts that Count IV fails for the additional reason that Illinois has upheld a Chicago redistricting plan with a maximum population deviation of 45%, citing *Miller v. City of Chicago*, 348 Ill. 34, 180 N.E. 627 (1932).[3]

    Plaintiffs have the initial burden to show (1) the existence of a population disparity that (2) could have been reduced or eliminated by (3) a good-faith effort to draw districts of equal proportion." *Baldus,* 849 F. Supp. 2d at 850 (citing *Karcher v. Daggett*, 462 U.S. 725, 730, 103 S. Ct. 2653, 77 L. Ed. 2d 133 (1983)). If plaintiffs meet this initial burden, then the burden shifts

---

[3] The equality of population or one person, one vote principle is interpreted with the same parameters whether under the Illinois Constitution or the U.S. Constitution. *Schrage v. The State Board of Elections,* 88 Ill. 2d 87, 100, 430 N.E. 2d 483, 58 Ill. Dec. 451 (1981).

to the City to show that "each significant variance between districts was necessary to achieve some legitimate goal." *Id.*

The Supreme Court has held that "an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations that are insufficient to make out a *prima facie* case." *Brown v. Thomson*, 462 U.S. 835, 842, 103 S. Ct. 2690, 77 L. Ed. 2d 214 (1983)). However, plaintiffs may still challenge a reapportionment scheme with deviations below 10%, but they bear a greater burden to show a violation of their voting rights. *Baldus,* 849 F. Supp. 2d at 850. Some courts have treated reapportionment plans with 10% or greater population deviations as presumptively valid, which may nevertheless be unconstitutional if the drafting process is arbitrary, discriminatory, or otherwise unsupported by traditional redistricting criteria. *Id.* (collecting cases).

Here, LWV concedes that the population deviation in the 2015 plan is less than 10% and therefore is presumptively valid.[4] LWV attempts to overcome this presumption by alleging that that the City adopted this plan simply to obtain the necessary votes to keep the issue of redistricting from requiring a referendum by the voters and that the City rejected other maps that would have preserved minority voting rights equally well while dividing the wards equally by population. (Compl. Dkt. #1, at ¶¶ 103-104). There are no allegations in the Complaint that show the 2015 plan targets an objectively defined group. Instead, LWV alleges the new plan favors certain incumbent alderman over others. Yet, virtually any reapportionment scheme will naturally make it easier for some alderman to be reelected and for some it will be more difficult given the change in their constituency. Moreover, LWV admits that the 2015 plan preserves minority voting rights and thus no objectively identifiable group has been singled out.

---

[4] LWV admits in the Complaint that the maximum deviation between "low" and "high" population wards is 8.7%.

11

"The Supreme Court has expressly rejected the argument that the possibility of drafting a 'better' plan alone is sufficient to establish a violation of the one person, one vote principle." *Daly v. Hunt*, 93 F.3d 1212, 1221 (4th Cir. 1996) (citing *Gaffney v. Cummings,* 412 U.S. 735, 740-41, 37 L. Ed. 2d 298, 93 S. Ct. 2321 (1973)). *Gaffney v. Cummings,* which involved deviation rates under 10%, instructs that judicial involvement in the inherently political and legislative process of apportionment "must end at some point, but that point constantly recedes if those who litigate need only produce a plan that is marginally 'better' when measured against a rigid and unyielding population-equality standard. The point is that such involvements should never begin." 412 U.S. at 750-51. In *Gaffney*, cited by both plaintiffs and the City and discussed elsewhere in this opinion, the Supreme Court found it unnecessary to even address the "state interest" argument given the plaintiff's failure to establish a prima facie case due to the low deviation rate. *Gaffney*, 412 U.S. at 740. Moreover, the Supreme Court has held that a legislature that creates categories that neither affect fundamental rights nor proceed along suspect lines, need not "actually articulate at any time the purpose or rationale supporting its classification." *Heller v. Doe,* 509 U.S. 312, 320, 113 S. Ct. 2637, 125 L. Ed 2d 257 (1993) (quoting *Nordlinger v. Hahn,* 505 U.S. 1, 15, 112 S. Ct. 2326, 120 L. Ed. 2d 1 (1992). This Court finds that the Complaint fails to state a claim for a constitutional violation based on a *de minimus* population deviation. Accordingly, this Court dismisses Counts III and IV.

    b. *Counts V and VI*

In Counts V and VI, the allegations relate to the shape of the ward boundaries as arbitrary and capricious in violation of the Equal Protection Clause (Count V) and as insufficiently compact in violation of the state law requirement in 65 Ill. Comp. Stat. 20/21-36 that the fifty wards of the City of Chicago be composed of territory that is compact and contiguous (Count

VI). Plaintiffs provide the new Second Ward as an example. The City moves to dismiss both Counts V and VI for lack of specificity. The City also moves to dismiss Count V for failure to state a claim because that Count fails to allege that the government action was motivated by a discriminatory purpose and had a discriminatory effect.

LWV presents a novel argument for an Equal Protection violation. Although the allegations in Count V are bare conclusions of the sort ordinarily insufficient to survive a motion to dismiss and this Court could dismiss it for that reason alone, it bears more explanation. It seems to this Court that LWV is attempting to plead a different kind of political gerrymandering; one not based on the political affiliations of constituents, but instead based on the supposed effort to draw ward lines in order to disfavor certain incumbent alderman. Thus, plaintiffs are asserting the disadvantaging of certain alderman as opposed to dilution of voters' political voice.

In *Davis v. Bandemer,* 478 U.S. 109, 119-127, 92 L. Ed. 2d 85, 106 S. Ct. 2797 (1986), the Supreme Court established the framework for political gerrymandering claims. The Supreme Court defined "political gerrymander" as not just line-drawing (*i.e.,* the drawing of election district lines in a fashion intended to achieve certain advantageous political affect) but also as other political action that affects electoral processes so as to advantage some citizens over others. *Id.* at 115. *Davis* also sets forth the characteristics of unconstitutional political gerrymandering: (1) intentional discrimination against an identifiable group; and (2) actual discriminatory effect on that group. *Id.* at 127; *see also Duckworth v. State Administration Board of Election Laws,* 332 F.3d 769, 774 n.2 (4th Cir. 2003).

In *Duckworth v. State Administration Board of Election Laws,* the Fourth Circuit Court of Appeals discussed discriminatory political effect as it has been addressed in the Supreme Court:

13

> The Supreme Court has said that contiguousness represents one of the principles of apportionment, along with compactness and respect for political subdivisions. *See Shaw v. Reno,* 509 U.S. 630, 647, 113 S. Ct. 2816, 125 L. Ed. 2d 511 (1993). But the Court has also said that 'these criteria are important not because they are constitutionally required – *they are not*, but because they are objective factors that may serve to *defeat* a claim that a district has been gerrymandered[.]' *Id.* at 647 (emphasis added). Thus, the Court, though noting that these factors – as *principles* of apportionment – represent valid state interest in apportionment, has never said that *lack* of such factors could be probative of discriminatory political effect. 332 F. 3d at 778.

Although plaintiffs here do not express the allegations in the Complaint as political gerrymandering, a fair reading of the Complaint suggests that they are complaining that political motivations are the driving force behind the 2015 redistricting plan, including the shape and contiguity of the new wards. Plaintiffs have not alleged either intentional discrimination against an identifiable group or actual discriminatory effect on that group. The political motivation alleged, to favor certain incumbent alderman and to disadvantage certain "independent" aldermen, does not by itself implicate the Equal Protection Clause.

In addition to the political motivation for the plan, plaintiffs have alleged that in passing the 2015 redistricting plan the City has not enacted a plan with the lowest deviation rate practicable and unnecessarily has divided neighborhoods, and, at least with respect to the Second Ward, failed to adhere to compactness. As a result of the political motivations, plaintiffs complain that the maximum deviation rate was not as low as it could have been and some neighborhoods have been divided, yet these allegations do not alone amount to a violation of the Equal Protection Clause of the Fourteenth Amendment. This Court has already addressed the issue of the population deviation. Similar to the pleading in *Cecere v. The County of Nassau, et al.,* 274 F. Supp. 2d 308, 316 (E.D.N.Y. 2003), there are no factual allegations in the complaint here to support an inference that the division of neighborhoods or the *de minimus* population deviation violates Equal Protection. In the drawing of any map, mathematical equality is one

factor among several that affects the contours of districts. Furthermore, there are no allegations in the Complaint to support an inference of intentional discrimination of an identifiable group and actual discriminatory effect on that group stemming from the new map. With respect to the allegations that the ward boundaries are "arbitrary and capricious" and without "rational relationship" to "any legitimate state purpose", those allegations are simply conclusions insufficient to overcome a motion to dismiss. Accordingly, this Court dismisses Count V of the Complaint.

The foregoing analysis however does not mean that plaintiffs have failed to articulate in Count VI a state law claim based on the boundaries of, at least, the Second Ward. "Federal courts are barred from intervening in state apportionment in the absence of a violation of federal law precisely because it is the domain of the States and not the federal courts to conduct apportionment in the first place." *Voinovich v. Quilter,* 507 U.S. 146, 156 (1993). This Court has dismissed all of the federal claims in the Complaint and thus declines to entertain the remaining state law claims in Count II and Count VI. 28 U.S.C. § 1367(c)(3).

**Conclusion**

For the reasons stated herein, this Court dismisses the Complaint.

Date: August 16, 2013

Entered: _____
United States District Judge